UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LINDA W. SCHUMACHER,      )
     )
     Plaintiff,      )
     )
     v.      )      No. 4:13CV351 TIA
     )
CAROLYN W. COLVIN, Acting      )
Commissioner of Social Security,      )
     )
     Defendant.      )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the Commissioner's final decision denying Linda W. Schumacher's

application for disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401, *et seq.*, and application for supplemental security income

under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* All matters are pending

before the undersigned United States Magistrate Judge, with consent of the parties,

pursuant to 28 U.S.C. § 636(c). Because the Commissioner's final decision is not

supported by substantial evidence on the record as a whole, it is reversed.

### I. Procedural History

On July 28, 2010, plaintiff Linda W. Schumacher applied for disability

insurance benefits (DIB) and supplemental security income (SSI), claiming she

became disabled on December 31, 2004, because of chronic asthma. (Tr. 126-32, 133-36, 174.) Upon initial consideration, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 69-76.) On October 5, 2011, a hearing was held before an administrative law judge (ALJ) at which plaintiff and a vocational expert testified. (Tr. 28-62.) On January 20, 2012, the ALJ issued a decision denying plaintiff's claims for benefits, finding plaintiff able to perform work as it exists in significant numbers in the national economy. (Tr. 10-24.) On December 21, 2012, the Appeals Council denied plaintiff's request to review the ALJ's decision. (Tr. 1-5.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff raises numerous claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff challenges the ALJ's determination regarding her residual functional capacity (RFC), arguing that the ALJ failed to accord proper weight to the opinion of her treating physician, Dr. Robins, and failed to include limitations in the RFC that were supported by the medical records as well as by Dr. Robins' opinion. Plaintiff also contends that the ALJ failed to cite medical evidence to support her RFC determination. Plaintiff also argues that the ALJ should have ordered a consultative examination regarding the extent to which plaintiff's mental impairment affected her ability to work. Finally, plaintiff claims

that the ALJ erred in finding her subjective complaints not to be credible. Plaintiff requests that the final decision be reversed and that she be awarded benefits, or that the matter be remanded for further proceedings. For the following reasons, the matter will be remanded for further consideration.

## II. Testimonial Evidence Before the ALJ

A.    <u>Plaintiff's Testimony</u>

At the hearing on October 5, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was fifty-two years of age. Plaintiff stands five feet, one inch tall and weighs 127 pounds. (Tr. 35.) Plaintiff left high school in the ninth grade and never obtained her GED. Plaintiff has received no vocational or other training. (Tr. 38.) Plaintiff currently receives unemployment benefits. (Tr. 37.)

Plaintiff's Work History Report shows that plaintiff worked as a school bus driver from June 1999 to approximately November 2004. From March to July 2005, plaintiff worked as a bartender and stocker at an Elks Lodge, as well as performed some clerical work. In 2006 and 2007, plaintiff worked as a housecleaner. From August 2007 to October 2009, plaintiff again worked as a school bus driver. (Tr. 205.) Plaintiff testified that she was placed on medical leave from this last job because of pain, pulmonary irritation, and an inability to

take her medication on account of the driving requirements of the job. (Tr. 39.) Plaintiff testified that she was ultimately fired because of her long period of medical leave. (Tr. 36-37.) Plaintiff testified to other short-term or temporary employment positions previously held and, further, that she was terminated from all positions for reasons related to her medical impairments. (Tr. 35, 40-43.)

Plaintiff testified that she was currently unable to work because of significant breathing difficulties. Plaintiff testified that she frequently is out of breath with climbing stairs, walking from her car to the grocery store, and walking through a building. Plaintiff testified that, while at the grocery store, she must lean on a cart for support. Plaintiff testified that temperature extremes also negatively affect her breathing. (Tr. 44.) Plaintiff testified that she uses a nebulizer and takes Albuterol, Singulair, Benadryl, Uniphyl, and Spiriva for her breathing impairments. (Tr. 47-48.)

Plaintiff testified that she also experiences headaches every day and has since her childhood. Plaintiff testified that the headaches sometimes make her sick. (Tr. 44.) Plaintiff testified that she takes Imitrex or Relpax for the condition. (Tr. 50.)

Plaintiff testified that she also has arthritis in her tailbone that sometimes feels like a knife or needle going through her back. Plaintiff testified that the pain sometimes prevents her from standing. Plaintiff testified that she also has pain in

her right hip that radiates to her knee, which her doctor suggested may be her ACL. Plaintiff testified that pain in her ankles causes difficulty with standing and walking, and that fibromyalgia pain in her upper back causes pain and twitching in her arms and hands. (Tr. 44-45.) Plaintiff testified that she takes Oxycodone and prescription strength Advil for pain. Plaintiff testified that she also takes Cymbalta for pain, but that it does not help her condition. Plaintiff testified that she takes Valium for restless legs. (Tr. 48-49.)

Plaintiff testified that she has kidney stones and scar tissue in her neck, but no testimony appears in the record that she is affected by these conditions. (Tr. 46-47.)

Plaintiff testified that she has depression and anxiety for which she takes Lexapro. (Tr. 50.) Plaintiff testified that she is uncomfortable in big crowds and does not go anywhere other than the grocery store, drug store, the doctor's office, and the library. Plaintiff testified that she has lost friends and has broken up relationships. Plaintiff testified that she has what she considers "normal" memory problems in that she sometimes forgets words or sometimes forgets where she placed things. (Tr. 52-53.)

As to her exertional abilities, plaintiff testified that she cannot sit for very long because of a "poking" sensation she feels in her hip and buttocks. Plaintiff testified that she must shift from side-to-side while sitting. Plaintiff testified that

she can lift a gallon of milk but must use both hands.  (Tr. 51-52.)

As to her daily activities, plaintiff testified that she reads books.  Plaintiff testified that she goes to the library and to the grocery store but gets help with taking things to the car.  Plaintiff testified that she tries to help her sister, who is seventy years of age, and that she able to do some chores for her while sitting, such as vacuuming.  (Tr. 53-54.)  Plaintiff testified that she has a driver's license and is able to drive.  (Tr. 38.)

B.    Vocational Expert Testimony

Gary Weinholdt, a vocational expert, testified at the hearing in response to questions posed by the ALJ.

Mr. Weinholdt classified plaintiff's past relevant work as a school bus driver as semi-skilled and medium; as a license clerk and a food order expediter as semi-skilled and light; and as a telephone solicitor as semi-skilled and sedentary.  (Tr. 57-58.)

The ALJ asked Mr. Weinholdt to consider an individual of plaintiff's age, education, and past work experience and who could perform work at the light exertional level.  The ALJ asked Mr. Weinholdt to consider the person to be limited to semi-skilled work and that she must avoid concentrated exposure to extreme heat, extreme cold, humidity, fumes, odors, dust, gases, and poor ventilation.  Mr. Weinholdt testified that such a person could perform plaintiff's

past work as a license clerk, telephone solicitor, and food expediter.  (Tr. 58.)

The ALJ then asked Mr. Weinholdt to consider the individual to have the same exertional and environmental limitations but that she was also limited to unskilled work and could have only occasional contact with supervisors, coworkers, and the public and no transactional interaction with the public.  Mr. Weinholdt testified that such a person could not perform the jobs to which he previously testified, but could perform other work such as an electronic accessory assembler, of which 1,500 such jobs exist in the State of Missouri and 75,000 nationally; and inspector and hand packager, of which 2,500 such jobs exist in the State of Missouri and 125,000 nationally.  (Tr. 59-60.)

The ALJ then asked Mr. Weinholdt to assume that, in addition to the limitations set out in the second hypothetical, the person was unable to complete an eight-hour workday at least twice a week because of her physical problems, to which Mr. Weinholdt testified that no work would be available for such a person. (Tr. 60-61.)

### III.  Medical Evidence Before the ALJ

In December 2003 and January 2004, Dr. D. Helton, D.O., prescribed Vicodin (hydrocodone) for plaintiff's chronic headache pain.  Plaintiff was also diagnosed with acute bronchitis; chronic obstructive pulmonary disease (COPD); and cervical, thoracic, lumbar, and sacral somatic dysfunction.  (Tr. 236-38.)

In February 2004, Dr. Helton noted that plaintiff continued to smoke, but plaintiff reported that she had not had any recent respiratory problems. Physical examination was unremarkable. Plaintiff was continued in her diagnoses of somatic dysfunction, COPD, and chronic headaches. Plaintiff was prescribed Vicodin and BuSpar and was given samples of Lexapro. (Tr. 235.)

In April 2004, plaintiff reported to Dr. Helton that she experienced shortness of breath with exertion. Plaintiff continued to smoke and reported that she was not ready to quit. Plaintiff was diagnosed with bronchitis and was instructed to avoid smoke, dust, and fumes. (Tr. 232-34.) On April 27, plaintiff requested a refill of pain medication, reporting that the medication helped but that the pain continued to be constant. Plaintiff reported the pain not to prevent her from engaging in daily activities or from working. Plaintiff also reported occasional depressed mood and diminished energy. It was noted that plaintiff stopped taking Lexapro but continued to take BuSpar, which helped her anxiety. Psychiatric examination showed plaintiff to exhibit normal judgment and insight. Memory was intact. No abnormalities of mood or affect were noted. Physical examination was unremarkable except for swollen nasal membranes. Dr. Helton diagnosed plaintiff with somatic dysfunction, chronic headaches, allergic rhinosinusitis, anxiety/ depression, and nicotine addiction. Plaintiff was instructed to restart Lexapro. BuSpar and Lortab (hydrocodone) were prescribed. (Tr. 232-33.)

On May 24, 2004, plaintiff reported doing well on her medication. Plaintiff's prescriptions for Lortab, BuSpar, and Albuterol were refilled. (Tr. 231.) On July 6, plaintiff reported to Dr. Helton that she recently had an asthma attack for which Albuterol provided minimal relief. Scattered expiratory wheezes were noted upon examination. Loratidine was prescribed. (Tr. 230.) Plaintiff's prescriptions for Lortab and BuSpar were refilled in August. (Tr. 229.)

Plaintiff returned to Dr. Helton on November 15, 2004, for medication refills. Plaintiff complained of lumbar pain. Plaintiff also reported that she injured her right ankle when she stepped off of some bleachers. Physical examination was unremarkable. Dr. Helton diagnosed plaintiff with somatic dysfunction, chronic headaches, COPD, generalized anxiety disorder, and depression. Plaintiff's prescriptions for Lortab and BuSpar were refilled. Plaintiff was given samples of Lexapro. (Tr. 226.) Plaintiff's medications were again refilled in April 2005, with samples of Advair given at that time. (Tr. 225.)

Plaintiff's medications were refilled in July 2005, at which time plaintiff was also diagnosed with hypertension. Lopressor was prescribed. Physical examination otherwise was unremarkable. (Tr. 224.) Plaintiff's prescriptions for Advair, Albuterol, Lortab, and Lopressor were refilled in October 2005 and again in February 2006. (Tr. 222-23.)

Plaintiff returned to Dr. Helton's office on March 10, 2006, and complained

of dizziness. Plaintiff also reported having difficulty getting her medication refills. Physical examination was unremarkable. Plaintiff was continued in her diagnoses of somatic dysfunction, chronic headaches, COPD, generalized anxiety disorder, depression, and hypertension. Plaintiff's prescriptions were refilled. (Tr. 221.)

On June 5, 2006, plaintiff visited Dr. Helton for follow up and reported that her depression was well controlled with Lexapro. Physical examination was unremarkable. Plaintiff's prescription for Lortab was refilled, and samples of Lexapro were given. (Tr. 218.) Physical examination in August continued to be unremarkable. Plaintiff's prescriptions for Lortab, Lopressor, Advair, and Albuterol were refilled. Samples of Lexapro were given. (Tr. 217.)

In October 2006, plaintiff reported to Dr. Helton that she had increased shortness of breath and wheezing associated with a cold. Dr. Helton diagnosed plaintiff with pneumonia. Dr. Helton prescribed valproic acid and Tramadol for headaches. On December 9, plaintiff reported that the Tramadol did not help. Valproic acid and Vicodin were prescribed. (Tr. 215-16.)

Plaintiff visited Dr. David L. Pittenger, D.O., on January 24, 2007, for pain management regarding her headaches and back pain. It was noted that plaintiff was "now able to hold down a job." Dr. Pittenger diagnosed plaintiff with migraine and tension headaches, as well as unstable low back. Plaintiff was prescribed Lopressor, Wellbutrin, and Lorcet (hydrocodone). (Tr. 291.) In

February, Dr. Pittenger noted plaintiff to wheeze. Plaintiff continued to complain of headaches. Plaintiff was diagnosed with depression, hypertension, cervical dysfunction, and headaches. Plaintiff was instructed to discontinue Lopressor because of wheezing, and Diltiazem was prescribed. Wellbutrin and Albuterol were also prescribed. (Tr. 290.)

Plaintiff visited Dr. Pittenger on April 3, 2007, for medication refills and continued to complain of headaches. Plaintiff also complained of cough and fatigue. Plaintiff was diagnosed with bronchiolitis, migraine headaches, and cervical dysfunction. Lexapro, Diltiazem, and Lorcet were prescribed. (Tr. 289.) Plaintiff returned to Dr. Pittenger on April 27 after having twisted her ankle. Dr. Pittenger also noted plaintiff's chronic low back pain. Plaintiff was prescribed Advil, Lorcet, and Advair. Plaintiff was instructed to rest, ice, and elevate her ankle. (Tr. 288.)

On May 21, 2007, plaintiff reported to Dr. Pittenger that her pain was controlled with Lorcet. It was noted that plaintiff was not using Advair. Wheezing was noted with expiration. Plaintiff was diagnosed with chronic lower back pain and asthma and was prescribed Lorcet and Advair. In June, plaintiff reported to Dr. Pittenger that her medication was stolen. Dr. Pittenger had a long discussion with plaintiff regarding her pain medication. Plaintiff's medications were refilled, including Lorcet. In July, plaintiff returned to Dr. Pittenger for an adjustment to

her back and for medication refills. Plaintiff's prescriptions were again refilled in August. (Tr. 284-87.)

Plaintiff visited Dr. Pittenger on October 3, 2007, and reported having shortness of breath. Wheezing was noted upon inspiration and expiration. Plaintiff was diagnosed with bronchiolitis and was prescribed medication, including Albuterol and Advair. In November, Dr. Pittenger noted continued wheezing and headaches. Lorcet, Symbicort, and Singulair were prescribed. It was noted that plaintiff had been off of Lexapro for two weeks. On December 1, plaintiff's Lorcet was refilled for lumbosacral dysfunction. On December 31, plaintiff's prescriptions were refilled for reactive depression and chronic low back pain. (Tr. 280-83.)

Between January and May 2008, plaintiff visited Dr. Pettinger on five occasions for medication refills for her back, headache, and bronchiolitis conditions. (Tr. 275-79.) On June 2, plaintiff complained of continued coughing, and Dr. Pettinger noted wheezing and coughing upon examination. Symbicort, Zyrtec, and Chantix were prescribed. (Tr. 274.) Dr. Pettinger also determined to discontinue plaintiff's narcotic medication (*id.*); but on July 7, he prescribed Lorcet for sciatica pain and sacroiliac pain. Plaintiff also reported having cramps in her feet at that time. (Tr. 273.) Plaintiff's prescriptions for Lorcet, Singulair, and Symbicort were refilled on July 29. (Tr. 272.)

Between August and December 2008, plaintiff visited Dr. Pettinger on six occasions for medication management of chronic low back pain, allergic rhinitis, sciatica, bronchiolitis, and asthma. Plaintiff's prescriptions were repeatedly refilled during this period, including for Lorcet, Symbicort, and Albuterol. (Tr. 266-71.) Between January and March 2009, plaintiff visited Dr. Pettinger on four occasions for medication refills. (Tr. 262-65.)

On March 25, 2009, plaintiff reported to Dr. Pettinger that her lower back had not been okay since fall. Plaintiff reported the pain to be in her tailbone, low back, and right leg. Plaintiff reported that her hips "stopped." Cough and mucous production was also noted. Plaintiff was diagnosed with degenerative joint disease of the low back and asthmatic bronchiolitis, and medication was prescribed. (Tr. 262.)

On April 20, 2009, Dr. Pettinger refilled plaintiff's prescription for Lorcet, and Wellbutrin and Paxil were added to plaintiff's medication regimen for reactive depression. On May 4, Dr. Pettinger noted increased wheezing and prescribed Prednisone. Plaintiff was instructed to discontinue her tobacco use. On May 13, plaintiff complained of headache pain, and Dr. Pettinger refilled her prescription for Lorcet. (Tr. 259-61.)

On June 9, 2009, plaintiff continued to complain of headaches and of wheezing. Dr. Pettinger counseled plaintiff on discontinuing tobacco and

"codone." Dr. Pettinger diagnosed plaintiff with uncontrolled hypertension, chronic pain, and bronchial asthma. Plaintiff was instructed to discontinue Paxil. Wellbutrin and Lorcet were prescribed. (Tr. 258.)

Between July and December 2009, plaintiff visited Dr. Pettinger on seven occasions for medication refills for her conditions of asthma, low back and hip pain, and hypertension. (Tr. 250-57.) On December 23, plaintiff reported to Dr. Pettinger that she was having crying and panic episodes. Dr. Pettinger restarted plaintiff on Lexapro. Plaintiff also reported that her headaches and wheezing had not improved. Symbicort and Singulair were prescribed. (Tr. 250.) Prednisone and Tramadol were prescribed on January 4, 2010, and plaintiff was referred to a neurologist. (Tr. 249.) On January 13, Dr. Pettinger diagnosed plaintiff with TMJ dysfunction, asthma, and reactive depression. Lexapro, Singulair, Symbicort, and Lorcet were prescribed. (Tr. 248.)

On February 26, 2010, plaintiff complained of increased pain to Dr. Pettinger but reported that her muscle weakness and fatigue had improved. Plaintiff also reported being happy with Lexapro and Wellbutrin. Physical examination showed no wheezing. Dr. Pettinger noted plaintiff's depression to be controlled. Dr. Pettinger continued to diagnose plaintiff with asthma, chronic headaches and back pain, several allergies, and possible viral syndrome. Medication was prescribed, including Lorcet and Wellbutrin. (Tr. 312.)

- 14 -

An x-ray taken of the lumbar spine on March 8, 2010, yielded negative results. (Tr. 293.) Pulmonary function tests performed in March 2010 showed moderately severe obstruction prior to the administration of medication, with significant improvement after medication. (Tr. 296-97.)

On March 25, 2010, plaintiff complained to Dr. Pettinger of increased wheezing. Plaintiff was continued on her medications. (Tr. 311.) On April 21, plaintiff reported that she experiences difficulty breathing when walking more than thirty feet. Plaintiff also continued to complain of chronic low back pain. Plaintiff was continued on her medications, and a nebulizer was prescribed. Nebulizer treatment was provided at the appointment for shortness of breath. (Tr. 309.) On May 18, plaintiff's medications were refilled for her diagnosed conditions of bronchiolitis and headaches. Celexa was also prescribed. (Tr. 308.) Plaintiff's prescriptions for Lorcet, Celexa, and Wellbutrin were refilled in June (Tr. 305); and on July 27, plaintiff was switched from Lexapro to Cymbalta. (Tr. 303.)

Plaintiff visited Dr. Pettinger on August 5, 2010, and reported having pain in her low back and neck. Plaintiff also reported that she experiences numbness in her buttocks and has problems standing. Plaintiff's prescriptions were refilled. (Tr. 302.) Plaintiff's prescription for Lorcet was refilled again on August 30. (Tr. 301.) On September 27, plaintiff's prescriptions were refilled for her diagnosed conditions of lumbosacral dysfunction, sciatica, and hypertension. (Tr. 325.)

On September 28, 2010, James Morgan, Ph.D, a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's mental impairments were not severe, finding plaintiff to have no limitations in activities of daily functioning and in concentration, persistence, or pace; mild limitations in maintaining social functioning; and no repeated episodes of decompensation of extended duration. (Tr. 313-23.)

On October 21, 2010, plaintiff reported to Dr. Pettinger that she cannot sleep when taking Cymbalta and that she feels "whacked out." Dr. Pettinger continued in his diagnoses of chronic low back pain and migraine headaches. Dr. Pettinger instructed plaintiff to discontinue Singulair and to double her dosage of Nasonex. Plaintiff's prescriptions for Cymbalta and Lorcet were refilled. (Tr. 324.)

Plaintiff visited Patients First Health Care (Patients First) on November 16, 2010, who noted plaintiff's history of uncontrolled asthma. It was noted that plaintiff stopped smoking one month prior. It was noted that plaintiff's chronic lumbar back pain was stable and controlled with her current medication. No depression was noted. Plaintiff was instructed to restart Singulair and to continue with Ventolin, Symbicort, and Spiriva for her asthma and COPD conditions. Plaintiff was also prescribed Uniphyl. Plaintiff was instructed to continue with Lorcet for her chronic back pain. (Tr. 326.)

Plaintiff returned to Patients First on December 14, 2010, and reported that her motivation, interest, and irritability had improved with Cymbalta but that taking an increased dose made her "feel funny." Plaintiff denied any depression or anxiety. Plaintiff reported having persistent shortness of breath with exertion less than fifty feet. It was noted that plaintiff's chronic lumbar back pain and depression were stable, and plaintiff was continued on Lorcet and Cymbalta. Plaintiff was instructed to return in one month. (Tr. 351.)

On January 11, 2011, plaintiff visited Dr. Christina A. Robins at Patients First for medication refills and for evaluation of a cough. Physical examination was unremarkable. Dr. Robins refilled plaintiff's prescription for hydrocodone for lumbago and Cymbalta for depression, which Dr. Robins noted to be controlled. Dr. Robins also noted plaintiff's asthma to be controlled. Dr. Robins' other diagnoses included cough, hypertension, and general osteoarthritis. (Tr. 348-50.)

Plaintiff returned to Dr. Robins on February 8, 2011, and reported her back pain to be relieved with pain medication. Dr. Robins noted the condition to be under fair control, and plaintiff's prescription for Lorcet was refilled. Plaintiff complained of muscle pain, however, and specifically in her right thigh and shoulder area when sitting too long or if she moves her arm too far. Physical examination was normal. Dr. Robins determined plaintiff's cough and depression to be improved and that plaintiff's asthma was under fair control. Plaintiff's

hypertension was noted to be under good control. (Tr. 345-47.) On March 3, Dr. Robins noted plaintiff's conditions to be under fair control. Plaintiff was doing well with her depression, but she reported irritable mood and loss of energy and was having some difficulties meeting home, work, or social obligations. Physical examination was normal. Plaintiff's prescriptions for Lorcet, Cymbalta, Uniphyl, Singulair, and Proair were refilled. (Tr. 342-44.)

Plaintiff returned to Dr. Robins on March 24, 2011, for follow up of mixed hyperlipidemia, fibromyalgia, generalized osteoarthritis, and benign hypertension. Dr. Robins noted plaintiff's chronic problems to also include depression, lumbago, and asthma. Plaintiff reported her pain to be in her low back and that it was aggravated by daily activities and by changing positions, but relieved by her medication. Dr. Robins noted plaintiff's fibromyalgia and osteoarthritis pain to be controlled with Vicodin and Cymbalta. Dr. Robins also noted plaintiff's hypertension and hyperlipidemia to be fairly controlled. (Tr. 340-41.)

Plaintiff returned to Dr. Robins for medication refills on April 19, 2011, and reported increased anxiety because of a friend having a stroke. Dr. Robins also noted an acute asthma exacerbation, and a nebulizer was ordered with instruction for nebulizer treatment two to four times every day. (Tr. 337-39.)

Plaintiff was admitted to Urgent Care on April 29, 2011, with increased symptoms of anxiety and depression. Dr. Amy Couch noted the exacerbation of

symptoms to be related to the recent death of a friend and to marital discord. Mental status examination showed plaintiff to be anxious and tearful but was otherwise unremarkable. Plaintiff was instructed to continue with her medications and a prescription for Valium was given. Plaintiff was also instructed to continue with her asthma medications for her increased cough. (Tr. 334-36.)

Plaintiff returned to Dr. Robins on May 31, 2011, who noted plaintiff's depression to be under poor control and not to have improved with Lexapro. Plaintiff reported irritable mood and loss of energy on most days. Dr. Robins instructed plaintiff to continue with Cymbalta and Lexapro, and Abilify was prescribed. Plaintiff was also advised to seek counseling. (Tr. 331-33.)

On June 20, 2011, Dr. Robins noted plaintiff's depression to be mild and that it had improved with the addition of Abilify. Plaintiff's dosage was increased. Dr. Robins also noted plaintiff's lumbago and asthma to be improved and stable, and that plaintiff's fibromyalgia had improved. Plaintiff reported having intermittent migraine headaches and a recent onset of right knee pain, aggravated by bending. Physical examination was unremarkable. Plaintiff was continued on her pain medications. (Tr. 328-30.)

Plaintiff was admitted to the emergency room at Jefferson Regional Medical Center on July 14, 2011, with complaints of having paranoid thoughts for six weeks that people are in her house and she is being followed. Plaintiff reported

that she hears people speaking to her when she is alone, telling her to harm herself. Plaintiff reported having called the authorities on numerous occasions to report that she is being stalked. Plaintiff denied any suicidal thoughts. Physical examination was normal in all respects. Plaintiff was uncooperative for a mental status examination. Plaintiff's mood was noted to be depressed and her thought process was illogical. Plaintiff's insight was noted to be poor and her judgment was impaired. Plaintiff's memory was intact. Plaintiff was admitted to the hospital with an admitting diagnosis of psychosis. (Tr. 354-75.)

Upon admission to Jefferson Regional Medical Center, plaintiff underwent a psychiatric evaluation from which she was diagnosed with schizoaffective disorder, panic, and anxiety. Plaintiff was assigned a Global Assessment of Functioning score of 40, and Dr. Ahmad Ardekani determined to place plaintiff on antipsychotic medication. Plaintiff likewise underwent a physical examination and complained of knee pain and muscle pain but denied any other complaints. It was noted that plaintiff smoked. Physical examination was normal in all respects. Baclofen was given for muscle pain and Motrin for knee pain. On July 18, plaintiff had no physical complaints. Plaintiff was discharged on July 19 with a discharge diagnosis of bipolar, mixed. Dr. Ardekani noted plaintiff's condition to stabilize during hospitalization, and plaintiff was discharged in improved condition with a prescription for Seroquel. Plaintiff also requested that she be given a

prescription for Baclofen inasmuch as it helped her fibromyalgia pain.  (Tr. 376-403.)

Plaintiff visited Dr. Robins on August 1, 2011, and reported that her depression had improved but that she stopped taking Abilify because of paranoia. Dr. Robins noted plaintiff's condition to be improving slowly and instructed her to continue with Valium, Cymbalta, and Lexapro.  Plaintiff also complained of back pain with numbness as well as a recent onset of dizziness.  Plaintiff reported her low back, tailbone, and hips to be aching worse than usual.  Dr. Robins opined that plaintiff's fibromyalgia pain was slightly worse because of increased activity. Plaintiff was instructed to continue to use her arms and work in the yard in order to work on strength.  Physical examination showed mild arthralgia and myalgia in the upper and lower extremities, bilaterally.  No focal signs or symptoms were noted. Dr. Robins noted plaintiff's strength to be good in the bilateral upper and lower extremities.  Plaintiff's pain medications were refilled.  (Tr. 407-09.)

Plaintiff returned to Dr. Robins on August 30, 2011, and reported improvement in her conditions.  Plaintiff reported that she was seeing a counselor for her depression.  Plaintiff requested samples of medications to better control her migraines.  Physical examination was normal.  Plaintiff's medications were refilled, and plaintiff was prescribed Asthmanex for an acute exacerbation of her asthma.  (Tr. 411-13.)

On September 7, 2011, Dr. Robins completed a Medical Source Statement (MSS) in which she opined that plaintiff could frequently and occasionally lift up to ten pounds; stand continuously for thirty minutes and for a total of one hour in an eight-hour workday; sit continuously for thirty minutes and for a total of one hour in an eight-hour workday; and push and/or pull continuously for thirty to forty-five minutes and for a total of one hour in an eight-hour workday. Dr. Robins further opined that plaintiff needed to recline for thirty minutes, three or four times a day; assume a supine position for thirty minutes, three or four times a day; and elevate both feet for thirty minutes, three to four times a day. Dr. Robins opined that plaintiff could occasionally bend, kneel, and reach and could frequently handle and feel. Dr. Robins opined that plaintiff should never be exposed to heights, temperature extremes, fumes, or vibration, and could occasionally be exposed to machinery. Dr. Robins reported that plaintiff experienced these limitations on account of her uncontrolled fibromyalgia, as demonstrated by pain in the bilateral upper and lower extremities; her moderately controlled asthma, which is easily exacerbated with fumes and temperature changes; and her lumbar disc disease/lumbar strain. Dr. Robins reported that plaintiff's pain was not fully controlled with medication and that she was unable to fully retain her job in the past because of her physical limitations. (Tr. 404-06.)

# IV.  The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2014.  The ALJ found that plaintiff had not engaged in substantial gainful activity since December 31, 2004, the alleged onset date of disability.  The ALJ found plaintiff's asthma/COPD, fibromyalgia, and mental disorder to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15-18.)[1]  The ALJ found that plaintiff had the RFC to perform light work as defined in the Regulations, with additional limitations that she avoid concentrated exposure to extreme heat, extreme cold, humidity, fumes, odors, dust, gases, and poor ventilation; and be limited to performing unskilled work with only occasional contact with supervisors, co-workers, and the public with no transactional interaction with the public.  (Tr. 18.)  The ALJ determined plaintiff unable to perform any of her past relevant work.  Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, electronic accessory assembler

---

[1] Although the ALJ found plaintiff's headaches and hypertension to be medically determinable impairments, she determined them to be non-severe.  The ALJ further determined plaintiff's history of back pain not to be a medically determinable impairment.  (Tr. 16.)  Plaintiff does not challenge these findings.

and inspector/hand packager. The ALJ therefore found that plaintiff was not under

a disability from December 31, 2004, through the date of the decision. (Tr. 22-24.)

## V. Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must

prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.

2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir.

1992). The Social Security Act defines disability as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled

"only if [her] physical or mental impairment or impairments are of such severity

that [she] is not only unable to do [her] previous work but cannot, considering [her]

age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a

five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v.*

*Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding

whether the claimant is engaged in substantial gainful activity. If the claimant is

working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007)

(internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

In this cause, plaintiff challenges the manner and method by which the ALJ determined her RFC, arguing that the ALJ improperly weighed the medical opinion of her treating physician and failed to cite sufficient medical evidence to support the RFC conclusion. Plaintiff claims the record to demonstrate that she experiences limitations in addition to those found by the ALJ and that a consultative psychological evaluation should have been ordered. Plaintiff also claims that the ALJ erred in her analysis finding plaintiff's subjective complaints not to be credible. Because the ALJ's final decision is not supported by substantial evidence on the record as a whole, the matter will be remanded for further proceedings.

A.    Credibility

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider

all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing her reasons for discrediting the testimony. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations." *Cline*, 939 F.2d at 565; *see also Renstrom,* 680 F.3d at 1066; *Beckley v. Apfel*, 152 F.3d 1056, 1059-60 (8th Cir. 1998). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001); *see also Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. *Tellez,* 403 F.3d at 957; *Pearsall*, 274 F.3d at 1218.

Here, plaintiff claims that the ALJ did not sufficiently discuss her reasons to

discredit plaintiff's subjective complaints and failed to cite to evidence in the record that was inconsistent with her complaints. Plaintiff's claim is without merit.

In her written decision, the ALJ set out numerous, detailed inconsistencies in the record to support her determination that plaintiff's subjective complaints were not fully credible. The ALJ first noted that plaintiff's daily activities were inconsistent with her complaints of disabling physical and mental limitations, specifically noting that plaintiff's claimed physical limitations on account of her shortness of breath and pain were inconsistent with the record that showed that plaintiff continued to smoke, helped with household chores including vacuuming, prepared meals, and drove alone to make trips to the grocery store and to the library. The ALJ also noted that plaintiff manages her own medications, pays her own bills, and manages her own savings and checking accounts. Plaintiff's Function Report also shows her to visit with family and friends, care for her own needs, watch television, read, crochet, and periodically attend church. (*See* Tr. 183-90.) Such activities are inconsistent with plaintiff's allegations of disability due to physical and mental impairments. *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010). The ALJ also noted that plaintiff's receipt of unemployment benefits after her alleged onset date was inconsistent with her claim of disability inasmuch as the acceptance of such benefits implies that she is able and available for work. *See Barrett v.*

*Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994).

The ALJ also noted that plaintiff's medications effectively controlled her impairments, s*ee Brace v. Astrue*, 578 F.3d 882, 885-86 (8th Cir. 2009) (evidence showed that, when taken, medication was successful in controlling mental illness); *Perks*, 687 F.3d at 1092-93 (conservative treatment for back pain with medication, coupled with reports that medication worked well to cover pain); *Clevenger v. Social Sec. Admin.*, 567 F.3d 971, 976 (8th Cir. 2009) (appropriate credibility determination included finding that claimant was "overall improved" after taking pain medication); and no evidence in the record shows plaintiff to have experienced side effects from her medication that were not abated with an adjustment to the medication. *See Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005) (no record of adverse side effects from medication). In addition, the ALJ noted plaintiff's treatment to be conservative in nature in that plaintiff was never treated by any specialist nor required frequent hospitalizations. *See Perks*, 687 F.3d at 1092-93 (conservative treatment for back pain consisted of medication only, which was effective); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). *But see Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998) (consistent diagnosis of chronic low back pain coupled with long history of pain management and drug therapy consistent with subjective complaints of pain).

The ALJ cited to isolated instances of plaintiff's noncompliance with her

treatment regimen to support her finding that plaintiff's complaints were not entirely credible. While a claimant's noncompliance with prescribed treatment is a basis upon which to find subjective complaints not credible, the undersigned finds the limited circumstances here upon which the ALJ relies, that is, forgetting to pick up blood pressure medication from the pharmacy in June 2006 (Tr. 218), being unable to afford to fill a prescription for Medrol Dosepak in November 2009 (Tr. 253), and being out of Singulair in November 2010 (Tr. 326) not to rise to such a level that plaintiff's complaints should be discredited on this basis. *Cf. Brown v. Barnhart*, 390 F.3d 535, 542 (8th Cir. 2004) (ALJ properly discredited subjective complaints for, *inter alia*, claimant's "continuing failure to comply with prescribed treatments."). However, given the ALJ's numerous other well-supported reasons to discredit plaintiff's subjective complaints, this one factor does not serve as a basis to reverse the ALJ's credibility decision. *Cf. Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (deficiency does not require reversal when it has no bearing on outcome).

Accordingly, in a manner consistent with and as required by *Polaski*, the ALJ considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from her credibility. Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to this

determination.  *Renstrom,* 680 F.3d at 1065; *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005); *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).

B.    Opinion Evidence

Upon concluding that plaintiff's subjective complaints were not entirely credible, the ALJ turned to the September 2011 MSS completed by plaintiff's treating physician, Dr. Robins, and accorded it little weight, finding it to be inconsistent with her own treatment notes and with other evidence of record and, further, that it was based primarily on plaintiff's subjective complaints rather than on any diagnostic evidence.  For the following reasons, the ALJ did not err in according little weight to Dr. Robins' opinion.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources.  *See* 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii).[2]  The Regulations require that more weight be given to the opinions of treating physicians than other sources.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques

---

[2] Citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the 2011 version of the Regulations, which were in effect at the time the ALJ rendered the final decision in this cause.  This Regulation's most recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this discussion but does not otherwise change the substance therein.

and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§

404.1527(d)(2), 416.927(d)(2); *see also Forehand v. Barnhart*, 364 F.3d 984, 986

(8th Cir. 2004). This is so because a treating physician has the best opportunity to

observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most
> able to provide a detailed, longitudinal picture of [a claimant's]
> medical impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the objective medical
> findings alone or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

When a treating physician's opinion is not given controlling weight, the

Commissioner must look to various factors in determining what weight to accord

the opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Such factors include the

length of the treatment relationship and the frequency of examination, the nature

and extent of the treatment relationship, whether the treating physician provides

support for her findings, whether other evidence in the record is consistent with the

treating physician's findings, and the treating physician's area of specialty. 20

C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The Regulations further provide that the

Commissioner "will always give good reasons in [the] notice of determination or

decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§

404.1527(d)(2), 416.927(d)(2).

Here, the ALJ properly discounted Dr. Robins' MSS inasmuch as it was

inconsistent with her own treatment notes.  The ALJ specifically noted that Dr.

Robins' statement in the MSS that plaintiff's fibromyalgia was uncontrolled was

wholly inconsistent with her treatment notes that consistently noted the impairment

to be controlled or "fairly" controlled.  *See Martise v. Astrue*, 641 F.3d 909, 925

(8th Cir. 2011) (ALJ may justifiably discount treating physician's opinion when it

is inconsistent with her own clinical treatment notes).  The ALJ also noted that

none of Dr. Robins' treatment records indicate that plaintiff was restricted or

limited in any respect, and especially not to the degree as opined in the MSS

checklist form.  An ALJ is permitted to discount a treating physician's MSS

"where the limitations listed on the form 'stand alone' and were 'never mentioned

in [the physician's] numerous records of treatment' nor supported by 'any

objective testing or reasoning.'"  *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir.

2005) (quoting *Hogan,* 239 F.3d at 961).  *See also Teague v. Astrue*, 638 F.3d 611,

615 (8th Cir. 2011) (little evidentiary weight accorded to functional limitations set

out in MSS check-off form because previous treatment notes did not report any

significant limitations); *Halverson,* 600 F.3d at 930 (inconsistency between

treating physician's treatment records and his functional assessment provides good

reason for ALJ to discount physician's opinion).  The ALJ also noted that Dr.

Robins appeared to rely quite heavily on plaintiff's subjective complaints to render

her opinion inasmuch as there were few, if any, diagnostic examinations upon

which she could base her opinion. Where a physician's opinions are largely based on a claimant's subjective complaints rather than on objective findings, an ALJ does not err in giving such opinions less than controlling weight. *Renstrom,* 680 F.3d at 1064.

Because the ALJ's determination to accord little weight to Dr. Robins' September 2011 MSS is supported by good reasons and substantial evidence, the Court defers to this determination.

C.    RFC Determination

Residual functional capacity is the most a claimant can do despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. *Goff,* 421 F.3d at 793; *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Eichelberger*, 390 F.3d at 591; *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001). As such, the ALJ must "consider at least some supporting evidence from a [medical professional]" and should obtain

medical evidence that addresses the claimant's ability to function in the workplace. *Hutsell*, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. *Id.*

Here, a review of the ALJ's decision shows that upon discrediting plaintiff's complaints and Dr. Robins' opinion, the ALJ simply determined that her RFC assessment was supported by the evidence of record and was thus warranted. (Tr. 22.) In setting out her RFC assessment, however, the ALJ cited and discussed only that evidence of record that served to discredit plaintiff's complaints and Dr. Robins' opinion. (*See* Tr. 18-22.) The ALJ engaged in no discussion or analysis of the evidence – and, indeed, cited *no* evidence – as it related to plaintiff's RFC, that is, what she is able to do despite her impairments. Drawing a conclusion regarding credibility is not equivalent to demonstrating by medical evidence that a claimant has the RFC to perform certain work-related activities. *Estabrook v. Apfel*, 14 F. Supp. 2d 1115, 1122 (S.D. Iowa 1998), *cited approvingly in Graham v. Colvin*, No. 4:12-cv-00863-SPM, 2013 WL 3820613, at *7 (E.D. Mo. July 23, 2013) (memorandum opinion). Instead, the ALJ's RFC assessment must discuss and describe how the evidence supports each conclusion and cite specific medical facts (*e.g.*, laboratory findings), nonmedical evidence (*e.g.*, daily activities, observations), and resolution of any material inconsistencies or ambiguities in the

evidence of record. Soc. Sec. Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996). The ALJ wholly failed to do so here.

The ALJ determined plaintiff to have the RFC to engage in light exertional work[3] except that she "must avoid concentrated exposure to extreme heat, extreme cold, humidity, fumes, odors, dust, gasses and poor ventilation" and is "limited to performing unskilled work with only occasional contact with supervisors, co-workers and the public with no transactional interaction with the public." (Tr. 18.) While the medical evidence of record spans from December 2003 to September 2011, no evidence from any medical source refers to plaintiff's ability to engage in work-related activities on or after her alleged onset date of disability, other than Dr. Robins' September 2011 MSS which was properly accorded little weight. While there is some record evidence that plaintiff was instructed as early as April 2004 to avoid smoke, dust, and fumes; exhibited good strength and mild arthralgia/myalgia in August 2011; and showed no abnormalities with examination during routine appointments for medication refills, there is no credited medical evidence that addresses plaintiff's ability to perform work-related activities on a regular and continuing basis. *See* SSR 96-8p, 1996 WL 374184, at *7. The ALJ made no specific findings regarding plaintiff's ability to lift, carry, stand, walk, or sit, other

_____

[3] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

than that she was generally limited to light work. Nor did she provide any explanation or refer to any evidence of record to support her finding that plaintiff's exposure to pulmonary irritants was limited to only concentrated exposure. Indeed, the ALJ cites to no medical evidence at all to support any of the limitations she identified. *Lauer v. Apfel*, 245 F.3d 700 (8th Cir. 2001) (ALJ's decision unclear as to the medical basis for the RFC assessment).

While the Court is mindful that the plaintiff bears the burden to establish her RFC, the ALJ's duty to develop the record is independent of this burden. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). Here, the plaintiff produced sufficient medical evidence to support the medically determinable impairments as found by the ALJ. However, none of this evidence addresses the extent to which these impairments, both severe and non-severe, affect plaintiff's ability to perform work-related activities on or after December 31, 2004.[4] Nevertheless, without citing to any medical or other evidence, the ALJ concluded that plaintiff's impairments caused a number of limitations, including non-exertional limitations. Because the ALJ must articulate the medical and other evidence upon which she bases her RFC determination, and she failed to do so here, it cannot be said that the RFC determination is supported by substantial evidence on the record as a whole.

---

[4] An RFC assessment must consider the combined effects of a claimant's severe and non-severe medically determinable impairments. *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008); 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

In the absence of any thoughtful discussion or analysis by the ALJ, this Court would be required to weigh the evidence in the first instance or review the factual record *de novo* in order to find the ALJ's RFC assessment to be supported by substantial evidence on the record as a whole. This the Court cannot do. *See Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

Where records from a claimant's medical sources do not provide sufficient medical evidence upon which an ALJ may determine whether a claimant is disabled, the ALJ is required to order medical examinations and tests in order for her to make an informed decision. *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985); 20 C.F.R. §§ 404.1517, 416.917. Given the sufficient medical evidence of record establishing plaintiff's medically determinable impairments, but the dearth of medical evidence addressing plaintiff's ability to perform work-related activities, the ALJ upon remand shall further develop the record by ordering consultative examination(s) to determine the extent to which plaintiff's physical and mental impairments, both severe and non-severe, affect her ability to perform work-related activities. Upon receipt of such additional information, the ALJ shall reconsider the record as a whole, including the medical and nonmedical evidence of record as well as plaintiff's own description of her symptoms and limitations, and reassess plaintiff's RFC. Such reassessed RFC shall be based on some medical evidence in the record and shall be accompanied by a discussion and

description of how the evidence supports each RFC conclusion. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007); SSR 96-8p, 1996 WL 374184, at *7.

## VI.  Conclusion

For all of the foregoing reasons, the Commissioner's decision is not supported by substantial evidence on the record as a whole and the case shall be remanded to the Commissioner for further consideration.  Inasmuch as a claimant's RFC is a medical question and some medical evidence must support the ALJ's RFC determination, the Commissioner shall obtain medical evidence upon remand that addresses plaintiff's ability to function in the workplace.  In view of the additional evidence to be procured upon remand, which may support or detract from plaintiff's subjective complaints, plaintiff's credibility shall likewise be reassessed in light of the fully developed record.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

    __/s/ Terry I. Adelman_____
    UNITED STATES MAGISTRATE JUDGE

Dated this 21st day of __August___, 2014.